UNITED STATES, Appellee,

v.

Leland A. THOMPSON, Private, U.S. Army, Appellant.

No. 62,905.

CM 8800580.

U.S. Court of Military Appeals.

Argued March 14, 1990.

Decided Sept. 20, 1990.

For Appellant: *Captain Paula C. Juba* (argued); *Colonel Robert B. Kirby, Lieutenant Colonel Russell S. Estey, Captain Timothy P. Riley* (on brief).

For Appellee: *Captain George R. Johnson* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Major Martin D. Carpenter* (on brief); *Major Kathryn F. Forrester*.

*Opinion of the Court*

COX, Judge:

Appellant was tried by a general court-martial before officer and enlisted members at Aschaffenburg, Federal Republic of Germany. He was charged with robbery, in violation of Article 122, Uniform Code of Military Justice, 10 USC § 922, and he entered pleas of not guilty. Prior to his trial on the merits, he absented himself without authority and remained away for the duration of the trial. He was convicted as charged, in absentia, and was sentenced to a dishonorable discharge, confinement and forfeiture of $650.00 pay per month for 36 months, and reduction to E–1. The convening authority approved the sentence, and the Court of Military Review affirmed in an unpublished opinion.

We granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY REFUSING TO GIVE A

DEFENSE REQUESTED CROSS–RACIAL IDENTIFICATION INSTRUCTION WHERE EYEWITNESS IDENTIFICATION WAS A PRIMARY ISSUE.

The prosecution evidence established that, during the early morning hours of June 14, 1987, in Aschaffenburg, appellant robbed Ms. Elif Atakan of 2700 deutsche marks. Ms. Atakan was a Turkish national and the proprietress of a German gasthaus. She was in the process of securing her establishment for the evening when appellant burst in on her, beat her extensively, and seized her black waitress' wallet containing the money. At one point, he started to tear her clothes off, but ultimately he desisted.

At another point, according to her translated testimony, he indicated to me by gesturing or pointing to the kitchen that he wanted me to go with him to the kitchen, and I was very afraid of going with him there because I knew that there was a lot of knives lying around on the kitchen table, and I was afraid that he might rape me there, and I was really very much afraid of going with him there.

So he kept pushing me in that direction until we reached what I would call a small stage, which is higher than what I'm sitting on right now, and on this little stage where a table is standing, he had me stand on that stage, but before when he pushed me over there, he kept hitting my head on the tables and on the counter too constantly. Then he demanded that I put my hands flatly against the wall and I did so, and as I turned my head a little bit, he took my head and hit me again and kept on hitting me and I thought I could not take it any more, I have to die from all this hitting.

For a moment during the attack, the victim managed to break free and grab an ashtray, which she "hit ... real hard against the window pane." To her disappointment, "the window pane did not break. However, the ashtray splintered totally." Fortunately, the noise seemed to startle appellant, for

he turned around, came over to me, grabbed me, put the key into my hand and told me to open the door. And I was glad that he wanted to leave. The problem was that there was a whole bunch of keys on the key ring and he didn't find the right one, so he handed it for me to take the right one and unlock the door. So he was dragging me to the door. I unlocked the door and opened it.

As soon as he was one step out the door, I tried to pull the door closed again and lock it behind him. But he turned around, grabbed me by the throat and was pressing it real hard. He hits me on the head again and at that moment, I thought I have to die. I thought now that he's leaving he wants to kill me so that there's no trace and no evidence. But luckily at that moment, two or three cars went by on the street, and when he saw the cars he let go of me.

At that point, the victim managed to close the door and lock appellant outside. She immediately called the police. Although "[t]he whole attack seemed to last very long," she calculated that "in fact it had been only seven to ten minutes," based on her knowledge of when it commenced and when the police arrived. During the entire attack, there was substantial illumination in the room, and she was able to see his face "distinctly." According to the victim, "I printed his face into my mind, ... [and] I will be always able to recognize him again."

The police arrived at the scene quickly and had Ms. Atakan transported by ambulance to a nearby hospital. She described her assailant and her stolen purse to the police. She suggested to them that "at that time, the [Aschaffenburg] volksfest was going on and that would be a place [for her assailant] to spend money." She was miffed when the officers did not seem to take the suggestion seriously. She was also incensed at the police for their apparent attitude that "all blacks look alike and ... there was not much chance of finding this man who attacked" her.

While she was being treated at the hospital only hours after the robbery, the German police did bring in a black American and presented him to her. According to the victim, "[H]e was pretty slim built and very tall, and I looked at his face and I knew, no, that is not this face."

After being released from the hospital that same day, Ms. Atakan decided to take matters into her own hands. Accompanied by her sister and niece, she stopped by the American kaserne to look for her assailant; however, she did not spot him. After observing servicemembers come and go for some time, she returned to her home to rest.

Later that same afternoon, the German police arrested appellant at the volksfest and brought him to the station.* The police then transported Ms. Atakan to the station for a possible identification. According to the victim:

In that room behind the counter, two [black] American civilians were standing. And as I walked in the room, and thought if they are the ones I should identify, then I have come in vain because they are not among them, and I told that to him [a police officer] immediately.

However,

A few minutes later, they brought another individual in that room.... And as they brought one individual through the back door, through the door into the room with the counter, nobody had to ask me. I immediately pointed at him and said, "That was him. That was him." And then Mr. Mueller asked me if I was sure that this was the person, and I said, "Yes, I am sure that that is the person." And as I saw him I got very upset and excited. And with the other one before, there was no need for me to get that upset and excited because it had

not been him. But the one they brought in then, that was him 100 percent.

In addition, the police showed her a black purse that had been found with appellant. She positively identified it as her own because, "[i]n one corner, there was a little tear, the seam was torn open and my purse I know anyway." When appellant was searched by the German police, they found money in his underwear.

Eventually, Ms. Atakan was brought to the American military police station. There she identified appellant three out of three times from line-ups involving five other Black Americans of similar build and color. She also identified appellant as the robber at an Article 32, UCMJ, 10 USC § 832, hearing and at a pretrial hearing on a defense motion *in limine* to suppress the identification. Of course, appellant was absent from the trial on the merits, so no attempt to identify him there was possible.

■ After the evidence on findings was presented, defense counsel requested an instruction on the general issue of identification. The proposed instruction is an almost verbatim copy of the now-familiar language suggested by the Court of Appeals for the District of Columbia in *United States v. Telfaire*, 469 F.2d 552, 558 (1972). This Court later "urge[d] ... the giving of ... [the *Telfaire*] instruction, if requested, *when identification is a primary issue in the case.*" *United States v. McLaurin*, 22 MJ 310, 312 (CMA 1986) (footnote and citations omitted; emphasis added).

In addition, defense counsel included in his proposal the following language on cross-racial identification:

In this case the identifying witness is of a different race than the accused. In the experience of many it is more difficult to identify members of a different race than members of one's own. If this is also your own experience, you may consider it

* The reason for appellant's arrest at the volksfest is not established in the record. Neither the German arresting officers nor the German waitress who apparently hailed the officers testified at the court-martial; and every time the German or American officials who did testify attempted to relate the reason for appellant's arrest, a defense objection based on hearsay was sustained.

128

in evaluating the witness's testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of the accused's race that he would not have greater difficulty in making a reliable identification.

This language is virtually identical to that recommended by Chief Judge Bazelon in his concurring opinion in *United States v. Telfaire, supra* at 561. It was designed to "set[ ] the narrow context in which racial differences are relevant, and further ensure[ ] that jury consideration of these differences stays within such properly delineated bounds." *Id.* at 560–61. We have also approved use of this instruction. *See* 22 MJ at 312 n.2; *cf. United States v. Scott,* 24 MJ 186, 193 (CMA 1987). The necessity for giving this instruction, however, is likewise determined by whether defense counsel requests it and whether *cross-racial* identification is a "primary issue" in the case.

■ Here, the victim's identification of appellant as her assailant unquestionably was a primary issue. Although his apprehension shortly after the robbery—with the purse in his possession—provided substantial circumstantial evidence, the fact that she unequivocally identified him on numerous occasions was undoubtedly a strong factor in convincing the members of his guilt. Under these circumstances, a *Telfaire* instruction was appropriately requested; the military judge duly obliged and gave the general instruction on identification. However, he rejected that portion of the proposed instruction dealing with cross-racial identification. In the judge's view, no evidence was presented at trial that raised cross-racial identification as an issue.

■ Appellant reiterates here his claim that cross-racial identification was "a primary issue in the case." We agree with the military judge and the Court of Military Review that no factual predicate existed which necessitated giving a cross-racial identification instruction.

Ms. Atakan observed her assailant for approximately 7 to 10 minutes. She positively identified him and her stolen purse within 24 hours of the offense. She obviously had no difficulty in distinguishing appellant from other young black men who had the same physical build and complexion; in fact, she had discounted numerous young black men as her assailant before she identified appellant. She also identified appellant at two hearings prior to trial on the merits.

Defense counsel's unsuccessful theory for rebutting Ms. Atakan's identification of appellant had little, if anything, to do with cross-racial identification. Apparently, Ms. Atakan failed to notice that appellant had a gold-capped front tooth, and defense counsel sought to exploit this oversight. In the victim's own words, however:

[T]here was no reason [for her assailant] to smile. He was upset all the time and he did not smile so I couldn't see a smile.

Defense counsel also argued that her identification of appellant at the German police station was the result of a suggestive "show-up." This claim was based on the fact that the first two candidates the victim saw were much larger than appellant and had moustaches, while appellant was clean-shaven. In addition, appellant may have been brought into the room escorted by one or more white German police officers.

However, nothing in Ms. Atakan's testimony indicates that she had any difficulty whatsoever in identifying appellant, in or out of a line-up. Further, defense counsel never cross-examined her about her ability to identify him in the line-up where he was among other black men of similar appearance and complexion. Indeed, there is no evidence that she had any special problem in identifying black people, and she never wavered in her ability to recognize appellant. To the contrary, she was offended at the suggestion of one of the German police

officers that a lot of black Americans "look very much alike."

If a cross-racial identification instruction was required on this meager basis, it would be required virtually every time an eyewitness and an accused are not of the same race. This we reject. *Cf. Commonwealth v. Horne*, 26 Mass.App. 996, 530 N.E.2d 353, 357 (1988). While we adhere to our approval of Chief Judge Bazelon's cross-racial identification instruction *in appropriate cases*, the mere happenstance that an eyewitness and the accused are not of the same race does not make cross-racial identification a primary issue or necessitate a special instruction. Testing the military judge's ruling for abuse of discretion, we find none.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.