Crystal MILLER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 64A03–0102–CR–62.

Court of Appeals of Indiana.

Dec. 17, 2001.

James V. Tsoutsouris, Porter County Public Defender, Matthew D. Soliday, Deputy Public Defender, Valparaiso, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Crystal Miller appeals her conviction for forgery,[1] a Class C felony. On appeal she contends that the trial court erred in refusing to give a tendered jury instruction concerning the potential impact of cross-racial identification on the accuracy of eyewitness identification.

We affirm.

1. See IC 35–43–5–2.

## FACTS AND PROCEDURAL HISTORY

On October 5, 1999, two African–American men stole Laverne Dettman's wallet containing her Indiana driver's license, her social security card, and two credit cards, one of which was a Visa card. Later the same afternoon, Jacqueline Kraft, a branch manager for Hobart Federal Savings Bank ("Bank"), noticed a car enter and park in an unusual location in the Bank's parking lot. Kraft noted that the occupants of the vehicle were two African–American men and an African–American woman. After sitting in the vehicle for approximately five minutes, the woman exited the car and approached the Bank.

Alerted by the unusual events, Kraft told her employees, "I want everybody to pay attention to what's going on. I think something is going to happen." Record at 316. The African–American woman then entered the Bank, approached teller Julie Scholz, presented Dettman's Visa card, and asked for a one-thousand-dollar cash advance on the card. Scholz requested additional identification and was presented with a Washington D.C. driver's license that contained the woman's picture and identified her as Laverne Dettman, 7525 May St. N.W., Washington D.C. 20002. With the paperwork apparently in order, Scholz completed the cash advance, and the woman left the Bank with one thousand dollars. Kraft observed Scholz and the woman during the entire transaction. After learning of the fraudulent cash advance, Dettman reported it to Detective Sergeant Robert Jarmula of the Hobart Police Department.

On October 18, 1999, the Hobart Police Department received a dispatch that two

African–American men and an African–American woman had fled the scene of a crime driving a green Buick. The police spotted the vehicle and a lengthy police chase ensued. After the car was stopped, police found Miller and two African–American men in the car, along with a typewriter and a small laminator. Later that day, police recovered a typewriter ribbon cartridge that had been thrown from the Buick during the chase. During the investigation, police discovered that the typewriter ribbon had been used to type Dettman's name and the Washington D.C. address listed on the license used in the October 5 forgery.

Investigating whether Miller could have been involved in the Dettman case, Jarmula included Miller in a six-person photographic lineup for Scholz to view on October 18, 1999. Based on the photographs, Scholz identified Miller as the person who fraudulently obtained the cash advance. Miller was charged with forgery.

At trial, Kraft and Scholz both identified Miller as the woman who forged Dettman's name at the Bank on October 5. The defense presented two alibi witnesses—Miller's sister Judy Sulton and Miller's friend Marsha Tate—both of whom testified that Miller was in Chicago on that date. Sulton testified that on October 5 Miller was babysitting for her children, and Tate testified that she and Miller took the children shopping for shoes.

Miller tendered an instruction concerning cross-racial identification. The court refused to give the requested instruction, but instead gave a general instruction concerning witness credibility. Miller was convicted of forgery and now appeals.

## DISCUSSION AND DECISION

 Miller claims that the trial court erred in refusing to give the tendered jury instruction concerning cross-racial identifi-

cation. The giving of jury instructions is a duty entrusted to the discretion of the court, and the trial court's decision will not be disturbed except where there is an abuse of that discretion. *Whitney v. State,* 750 N.E.2d 342, 344 (Ind.2001); *Clark v. State,* 732 N.E.2d 1225, 1230 (Ind.Ct.App. 2000). A party is normally entitled to have a tendered instruction read to the jury. *Morris v. K–Mart, Inc.,* 621 N.E.2d 1147, 1148 (Ind.Ct.App.1993), *trans. denied* (1994). In reviewing a trial court's decision to refuse a tendered jury instruction, we consider: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the jury instruction; and (3) whether the substance of the proffered instruction is covered by other instructions. *Whitney,* 750 N.E.2d at 344; *Chambers v. State,* 734 N.E.2d 578, 580 (Ind.2000); *Murrell v. State,* 747 N.E.2d 567, 573 (Ind.Ct.App.2001), *trans. denied.*

Miller argues that because she is African–American and Scholz and Kraft, the only witnesses to identify her as the woman in the Bank, are Caucasian, it was error for the trial court to refuse to give the jury the following tendered instruction:

> You know that the identifying witness is of a different race than the Defendant. When a witness, who is a member of one (1) race identifies a member who is of another race, we say there has been a cross-racial identification. You may consider, if you think it is appropriate to do so, whether the cross-racial nature of the identification has affected the accuracy of the witness' [sic] original perception and/or the accuracy of a subsequent identification.

*Record* at 100.

The court gave the jury the following preliminary and final instruction with regard to the credibility of witnesses:

> You are the exclusive judges of the evidence, the credibility of the witnesses

and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; the manner and conduct of the witness while testifying; any interest, bias or prejudice the witness may have; any relationship with other witnesses or interested parties; and the reasonableness of the testimony of the witness considered in light of all the evidence in this case.

You should attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is telling the truth. You should not disregard the testimony of any witness without a reason and without careful consideration. If you find conflicting testimony, you must determine which of the witnesses you will believe and which of them you will disbelieve.

In weighing the testimony to determine what or whom you will believe, you should use your own knowledge, experience and common sense gained from day-to-day living. The number of witnesses who testify to a particular fact, or the quantity of evidence on a particular point need not control your determination of the truth. You should give the greatest weight to that evidence which convinces you most strongly of its truthfulness.

*Id.* at 136, 157.

We first note that, while recognizing the general hazards of identification evidence in certain circumstances, our supreme court has nevertheless held that " 'Indiana law ... is distinctly biased against jury instructions which single out eyewitness identification testimony.' " *Hopkins v. State*, 582 N.E.2d 345, 353 (Ind.1991) (quoting *Brown v. State*, 468 N.E.2d 841, 843 (Ind.1984)). Here, the tendered instruction both singled out eyewitness identification testimony, and its substance was covered by the preliminary and final instruction that informed the jury that it is the exclusive judge of witness credibility and could disregard the testimony of a witness if it had reason to do so.

The court's instruction gave the jury the opportunity to believe or disbelieve the testimony of Kraft and Scholz or Sulton and Tate. Kraft and Scholz both claimed that Miller was in the Bank on October 5. In contrast to these statements, Sulton testified that Miller was babysitting for her children, and Tate testified that she went shopping with Miller in Chicago on October 5. The jury believed the Bank employees and disregarded the alibi witnesses.

The instruction allowed the jury to draw on its own "knowledge, experience, and common sense gained from day-to-day living." *Record* at 136, 157. Several of the answers elicited during voir dire reveal that reliance on experience and common sense would have allowed due consideration of cross-racial identification. During voir dire, defense counsel's questions reminded the jurors that Miller was the only African–American in the courtroom. *Id.* at 213–15, 228–30. Voir dire questioning also focused on the questionable reliability of eyewitness testimony, and an alternate juror even commented that he had once been wrong about facts he gave in an eyewitness account. *Id.* at 223, 259. Finally, during voir dire, the jurors were asked questions that caused them to consider the difficulty of picking a suspect of another race out of a line-up. *Id.* at 232. The trial court's instruction to use knowledge, experience and common sense would have allowed the jurors to fully consider the cross-racial identification by Kraft and Scholz.

Miller cites *State v. Cromedy*, 158 N.J. 112, 727 A.2d 457 (1999), a New Jersey Supreme Court case, to support her theory

that the tendered jury instruction was required. In *Cromedy*, a white woman was robbed and raped in her apartment by an African–American man. During the three days following the crime, the victim assisted with a composite sketch and viewed slides and photographs of possible suspects. Although the defendant's photo was included in the photographs shown to the victim, she was unable to identify him or any other person as her assailant. Almost eight months later, the victim saw the defendant on a street corner, believed he was her attacker, and called the police. At trial, after being denied an instruction on cross-racial identification, Cromedy was convicted on the sole basis of the victim's eyewitness testimony. *Cromedy*, 727 A.2d at 458. On appeal, the New Jersey Court of Appeals agreed that the trial court did not err in refusing to give the tendered instruction. *Id.*

The New Jersey Supreme Court reversed Cromedy's conviction and remanded the case for a new trial. The court held that a cross-racial identification instruction should be given when identification is a critical issue, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability. *Id.* at 467. The court found that the circumstances of the case raised doubt about the reliability of the identification, especially when the victim did not identify the defendant for almost eight months despite the fact that his picture was shown to the victim within four days after the crime. *Id.*

Our case can be readily distinguished from *Cromedy*. Scholz's identification arose from witnessing Miller inside the well-lit Bank during the ten to fifteen minutes required to process the cash advance, and Kraft's identification arose from observations of Miller both in the parking lot and during the transaction while Kraft was in an alerted state that something was

going to happen. Both witnesses identified Miller within two weeks of the crime. Furthermore, unlike *Cromedy*, here there were two witnesses and additional corroborating evidence in the typewriter ribbon cartridge.

■ In *Murrell*, our court addressed the issue of cross-racial identification when the defendant requested a jury instruction on a cross-racial identification made by a Caucasian State Trooper of an African–American defendant. Citing *Cromedy*, our court denied the defendant's request, finding that the he had "not demonstrated a specific risk that Trooper Fitzgerald's identification may have been mistaken due to cross-racial factors." *Murrell*, 747 N.E.2d at 573. Likewise, this trial court was not required to give the cross-racial instruction in the absence of Miller showing a specific risk that Kraft and Scholz may have been mistaken due to cross-racial factors. No such risk was shown.

■ Here, the jury was instructed on the general principles of determining the credibility of the witnesses. "An instruction directed to the testimony of one witness erroneously invades the province of the jury when it intimates an opinion on the credibility of a witness or the weight to be given to [her] testimony." *Perry v. State*, 541 N.E.2d 913, 917 (Ind.1989). Because Miller's tendered instruction improperly singled out the testimony of the eyewitnesses, and the substance of the instruction was adequately covered by the court's general instruction, we find that the trial court did not err in refusing to give the cross-racial identification instruction.

Affirmed.

BAILEY, J., and BROOK, J., concur.