STATE OF CONNECTICUT *v.* JIMMY L. WIGGINS
(AC 22217)

Lavery, C. J., and Foti and Schaller, Js.

---

[16] See footnote 9.

Argued December 10, 2002—officially released January 28, 2003

*Gilbert Shasha*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *David J. Smith*, assistant state's attorney, and *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Jimmy L. Wiggins, appeals from the judgment of conviction, rendered after a jury trial, of sale of cocaine in violation of General Statutes § 21a-277 (a).[1] The sole issue on appeal is whether the court improperly refused to instruct the jury on cross-

---

[1] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

racial identification as requested by the defendant. We conclude that the defendant was not entitled to such an instruction and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of November 4, 1998, Michael Cancellaro, an undercover police officer with the state-wide narcotics task force, entered 423 East Main Street in Norwich to make a purchase of narcotics. The task force had obtained information that someone using several nicknames, one of which was "Billy," was selling crack cocaine on the second floor of that address. Cancellaro was "wired" and had $50 in state funds on his person.

When Cancellaro arrived at the second floor apartment, he knocked and a woman named Gwen answered the door. He told her he wanted to buy crack cocaine. Gwen responded that the dealer was away, but would return shortly and invited Cancellaro inside. After a short wait, Cancellaro heard someone enter the apartment and Gwen announced, "he's here" and led Cancellaro into a bedroom. A man who said his name was Billy was sitting on a bed. He was wearing a heavy green parka with the hood up. He had what appeared to be a Jamaican accent; he was a black male in his mid-twenties with a medium to dark complexion, medium build, round face and he stood about five feet, eight inches tall. The parties exchanged the $50 for a plastic bag containing crack cocaine. After leaving the apartment, Cancellaro rendezvoused with Norwich police Detective Christopher Ladd, the lead officer on the investigation. Cancellaro provided Ladd with the cocaine and a description of the person from whom he had purchased the cocaine. No arrest was made at that time.

As part of their follow-up investigation, the police conducted surveillance of 423 East Main Street and on

November 11, 1998, Ladd saw someone matching the seller's description exiting the building and driving away. A computer check of the vehicle's license number revealed that the car was registered to the defendant, who was the only one observed at that location matching the description given by Cancellaro.

On November 13, 1998, Ladd showed Cancellaro a photographic array of eight black males of similar age and description as the defendant. Photograph number seven was of the defendant, and Cancellaro identified that photograph as the seller, "Billy."[2]

On the basis of that identification, the defendant was arrested and charged with the sale of cocaine on March 11, 1999, and subsequently was tried before a jury. Although Cancellaro was unable to identify the defendant at trial, he testified that he was sure that the man he identified in the photographic array was the seller.

The defendant filed a request to charge containing numerous instructions on identification. The issue on appeal involves the defendant's request to charge, number eight, which sought an instruction as follows: "An important factor to be considered in assessing the reliability of an identification is whether the witness and the person identified are of the same or different races. In general, there is a much greater possibility of error where the races are different than where they are the same."

Defense counsel argued at trial: "I think the jury needs to be told particularly that cross-racial identification is less reliable than in, than an intraracial identification in view of the fact that the evidence has made clear, the police officer, by observation, though not by testimony, is a Caucasian. And the citizen accused, and

---

[2] The defendant did not file a motion to suppress relative to that identification by Cancellaro.

the perpetrator of the crime, both of those persons were black. And under those circumstances, I think it's particularly appropriate to highlight to the jury that fact as commented on by the majority opinion and particularly as I think persuasively advanced by . . . the dissent."[3]

The court refused to instruct as requested on the cross-racial identification, but did charge generally on identification, much of which was as requested by the defendant.[4]

We first note that in reviewing the defendant's claim that the court improperly denied his request for a jury instruction on cross-racial identification, we are adopting an abuse of discretion standard of review. We recog-

___

[3] The defendant's argument before the court referred to *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999) (*Berdon, J.,* dissenting).

[4] The court instructed on identification as follows: "In arriving at a determination as to the matter of identification, you should consider all the facts and circumstances that existed at the time of the observation of the perpetrator by each witness. In this regard, the reliability of each witness is of paramount importance, since identification testimony is an expression of belief or impression by the witness. Its value depends upon the opportunity and ability of the witness to observe the offender at the time of the event, and to make an accurate identification later. It is for you to decide how much weight to place upon such testimony.

"In appraising the identification of any witness, you should take into account whether the witness had adequate opportunity and ability to observe the perpetrator on the date in question. This will be affected by such considerations as the length of time available to make the observations, the distance between the witness and the perpetrator, the lighting conditions at the time of the offense, whether the witness had known or seen the person in the past, and whether anything distracted the attention of the witness during the incident.

"You should also consider the lapse of time between the occurrence of the crime and the photo identification by the witness. You should also consider the witness' physical and emotional condition at the time of the incident, and the witness' powers of observation in general. In short, you must consider the totality of the circumstances affecting identification. Remember, you must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime, or you must find him not guilty."

nize that although a defendant may not be entitled to such a requested instruction as a matter of law, trial courts may, in the proper exercise of discretion, weigh the unique facts of a particular case in relation to an appropriate charge and conclude that an instruction on cross-racial identification is appropriate.

"Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law . . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Portee*, 55 Conn. App. 544, 555, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000). On the basis of the record before us in this case, however, we cannot conclude that the defendant has sustained his burden of demonstrating an abuse of discretion in the court's refusal to instruct on cross-racial identification.

Our Supreme Court "has specifically rejected the notion of special treatment for defendants in cross-racial identification situations . . . holding that the mere fact that a defendant is of a different race than a witness does not entitle the defendant to a special instruction on eyewitness identification at trial. *State* v. *Cerilli*, 222 Conn. 556, 571–72, 610 A.2d 1130 (1992)." *State* v. *Porter*, 241 Conn. 57, 135 n.80, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Courts in other jurisdictions also have refused to require such instructions.[5]

---

[5] See *Lenoir* v. *State*, 77 Ark. App. 250, 72 S.W.3d 899 (2002) (due process not violated by court's refusal to give cross-racial instruction); *Miller* v. *State*, 759 N.E.2d 680 (Ind. App. 2001) (instruction proper only when defendant shows specific risk identification mistaken due to cross-racial factors); but see *State* v. *Cromedy*, 158 N.J. 112, 131–32, 727 A.2d 457 (1999) (requiring cross-racial instruction where only one eyewitness).

Although cross-racial identification jury instructions may not be required, cross-examination and closing argument may be employed to demonstrate the problems that might arise as a result of cross-racial identification. Our review of the record indicates that the defendant was neither limited on his cross-examination of Cancellaro, nor on his argument regarding the reliability of that cross-racial identification.

The court's instruction to the jury, read in its entirety, charged that as to credibility of witnesses, including police officers, the jury should consider opportunity and ability to observe, the circumstances of the viewing and the time period between the crime and the witness' viewing of the array. The instruction concerned many identification factors. We conclude that the defendant cannot prevail on his claim that the court abused its discretion in not giving his requested instruction,[6] nor, if he is making such a claim, that it was reasonably probable that the jury was misled by the court's instruction with respect to identification.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] During oral argument, the defendant agreed that his requested instruction did not ask the court to instruct that the jury "may consider, if it is appropriate to do so, whether the cross-racial nature of the identification affected its accuracy," but rather asked the court to direct the jury to accept as a fact that there is a much greater possibility of error in cases of cross-racial identification.

[7] Although the defendant cites to *United States* v. *Telfaire*, 469 F.2d 552 (D.C. Cir. 1972), he does not claim that the trial court improperly instructed as to eyewitness identification generally. A charge under *Telfaire* instructs the jury to consider, in evaluating the identification testimony of a witness, the following factors: The adequacy of the witness' opportunity and capacity to observe the perpetrator, the length of time to observe the perpetrator, the proximity of the witness to the perpetration, whether the witness knew or saw the perpetrator prior to the incident, whether the identification was the product of the witness' recollection and the credibility of the witness. Id., 558–59.